**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES DIVISION OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>    Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>    Defendant. | No. C 06-4103-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND THE DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      *1.  The parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      *2.  The current system for recording attendance* . . . . . . . . . . . 5
      *3.  The new system* . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      *4.  Testing and plans to roll out the new system* . . . . . . . . . . . 8
      *5.  Relevant collective bargaining agreements* . . . . . . . . . . . . 12
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      *1.  The original complaint and the motion for preliminary injunction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      *2.  The renewed motion for preliminary injunction and the motion to dismiss* . . . . . . . . . . . . . . . . . . . . . . . . . 15
      *3.  The amended complaint and clarification of issues for hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.  LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
    A.  *The Motion To Dismiss For Lack Of Subject Matter Jurisdiction* . . . . .  20
        *1.*  *Arguments of the parties*  . . . . . . . . . . . . . . . . . . . . . . .  21
            *a.*  *The Carrier's initial argument*  . . . . . . . . . . . . . . . .  21
            *b.*  *The Union's response*  . . . . . . . . . . . . . . . . . . . . .  23
            *c.*  *The Carrier's reply* . . . . . . . . . . . . . . . . . . . . . .  25
        *2.*  *Standards for dismissal for lack of subject matter*
            *jurisdiction*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
        *3.*  *Subject matter jurisdiction under the Railway Labor Act* . . . .  27
        *4.*  *Is the present dispute "major" or "minor"?* . . . . . . . . . . .  32
            *a.*  *Terms of the pertinent agreements* . . . . . . . . . . . . . .  32
            *b.*  *Whether the dispute is comprehended within the*
                *agreements* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
                *i.*  *Scope of the agreements*  . . . . . . . . . . . . . . . .  34
                *ii.*  *The effect of past practice* . . . . . . . . . . . . . . .  38
            *c.*  *Creation or acquisition of rights*  . . . . . . . . . . . . . .  39
            *d.*  *Presumptions*  . . . . . . . . . . . . . . . . . . . . . . . . .  40
        *5.*  *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
    B.  *The Motion For Preliminary Injunction* . . . . . . . . . . . . . . . . . . . .  42

III.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

I n this action, the plaintiff railway workers union seeks injunctive and other appropriate relief pursuant to the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, to remedy the defendant railroad's allegedly unlawful alteration of the statutory status quo between the parties by seeking to impose, unilaterally and in derogation of statutory and collective bargaining requirements, "iris recognition technology" to record attendance of employees

2

of "rail" and "tie" gangs employed by the defendant. The union seeks a preliminary injunction to maintain the status quo while the parties pursue this litigation, but the railroad has moved to dismiss for lack of subject matter jurisdiction. The issues presented in the two motions are intertwined to the extent that both involve the question of whether the parties' dispute is "major" or "minor" within the meaning of the RLA, and if the parties' dispute is "minor," this court does not have subject matter jurisdiction to enter a preliminary injunction or to grant any other relief. Therefore, the court ordered a joint hearing on both motions and now enters a joint ruling.

## I. INTRODUCTION

### A. Factual Background

The factual background to the motions presently before the court is gleaned from the plaintiff's December 15, 2006, Complaint (docket no. 2);[1] the plaintiff's January 19, 2007, renewed Motion For Preliminary Injunction (docket no. 19);[2] the defendant's January 29, 2006, Memorandum In Opposition To Plaintiff's Motion For Preliminary Injunction (docket no. 22), and January 29, 2007, Motion To Dismiss For Lack Of Subject

---

[1]On February 6, 2007, the plaintiff filed a First Amended Complaint (docket no. 24), but the plaintiff had represented to a member of the court's staff prior to the filing of the First Amended Complaint that the amendment did not include any new factual allegations regarding the "status quo" issue before the court on the plaintiff's motion for preliminary injunction or otherwise alter the issues before the court on the motion for preliminary injunction.

[2]The plaintiff union filed its original Motion For Preliminary Injunction (docket no. 6), which was almost identical to the motion now before the court, on December 29, 2006. The court eventually denied that motion, in light of the plaintiff's representation that a hearing on the motion was no longer needed, without prejudice to reassertion. The Motion For Preliminary Injunction (docket no. 19) now before the court is that reassertion.

Case 5:06-cv-04103-MWB   Document 34   Filed 02/16/07   Page 3 of 43

Matter Jurisdiction (docket no. 21); the plaintiff's February 9, 2007, Opposition To Defendant's Motion To Dismiss And Reply Memorandum In Support Of Plaintiff's Motion For Preliminary Injunction (docket no. 30); and the defendant's February 12, 2007, Reply Memorandum In Support Of Defendant's Motion To Dismiss For Lack Of Subject Matter Jurisdiction (docket no. 31). The parties agreed that no further evidence needed to be submitted at the hearing on the pending motions, so that hearing consisted of oral arguments only.

### 1. *The parties*

In light of the submissions noted above, it appears that plaintiff Brotherhood of Maintenance of Way Employees, Division of the International Brotherhood of Teamsters (the Union)—an unincorporated labor organization with its headquarters in Southfield, Michigan—is the certified bargaining representative of the maintenance of way craft or class. Defendant Union Pacific Railroad Company (the Carrier) is a "carrier" within the meaning of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, with its principal place of business in Omaha, Nebraska, although it regularly conducts business in this judicial district and other areas in the western portion of the United States. The Union's members perform maintenance of way and repair functions for the Carrier's tracks and certain other aspects of its rail system in "rail gangs" and "tie gangs." The dispute between the Union and the Carrier that is the basis for the present litigation arises from the Carrier's alleged intention to introduce unilaterally a new method to verify the attendance of Union members at job locations. To put that dispute in context, the court must first review the current system for recording attendance used by the Carrier.

4

### 2.    *The current system for recording attendance*

The Union alleges that the "rail gangs" and "tie gangs" providing maintenance and repair functions for the Carrier may consist of dozens of its members, but the Carrier points out, and the court finds, that "gangs" may also consist of far fewer members and, indeed, may consist of only a single person, such as a track inspector, bridge inspector, flange oil operator, or operator of certain machines. Whatever the size of the "gang," employees in a particular "gang" are given a job assignment to report to a particular work location to which they are required to travel. At the reporting location, a foreman or assistant foreman, acting as timekeeper, records the employees' attendance and time worked, or in the case of single-member gangs, the employee himself or herself reports attendance and time. The Union contends that the established practice, for decades, has been for employees simply to respond to a roll call by the timekeeper or otherwise to be recognized by the timekeeper at the work location to which the employees have been assigned. The Carrier, on the other hand, contends that methods for reporting attendance and work hours have varied greatly from employee to employee depending upon such things as the size of the "gang" to which the employee has been assigned. While the Carrier concedes that roll calls have been typical for larger work groups, the Carrier contends that such a procedure certainly was not the only method used to verify the attendance of Union members at reporting locations. For example, the Carrier points out that individuals who act as a one-person "gang" may record their attendance and time on computers, from which the information is later directly downloaded into the Carrier's payroll accounting system.

The parties agree that, before the advent of computers at the reporting locations, attendance was recorded in written records or telephoned in to the Carrier by the timekeeper for the gang or the employee himself or herself. The Carrier asserts, and the

5

Union does not dispute, that a significant change in timekeeping occurred in 1986 when the Carrier unilaterally implemented the Gang Management System (GMS), which involves direct entry of time and attendance data by a timekeeper into a computer terminal or a call by the timekeeper to a GMS clerk in Omaha to report attendance information. The Carrier argues that over 95% of time and attendance information is now entered directly into a computer along with production reporting and other gang-related information.

The Carrier contends, and the Union does not dispute, that the Carrier has always unilaterally determined the method for timekeeping practices used for Union members and that the Union has made no prior attempt to require negotiation over the establishment of timekeeping systems or timekeeping practices. As the Union points out, however, the changes in recording and reporting attendance and hours under the GMS have not required most Union members to do anything different to demonstrate their attendance at the reporting location. In other words, the Union contends, Union members have always and still register their attendance at job locations by answering to their names in a roll call or by being recognized by the timekeeper, whatever changes the Carrier has made in the method to record the employees' attendance for the Carrier's records. The Union points out that its members have never been required to use "interim" methods of registering their attendance, such as punching time cards, presenting photo identification cards, scanning electronic identification cards, or offering finger or palm prints, before the Carrier attempted to introduce unilaterally an entirely new way for Union members to indicate their attendance at the work location.

### 3. *The new system*

The new method for indicating or verifying attendance at issue here is described by the parties as "iris recognition technology." Iris recognition technology is a system for photographing, analyzing, and recording biometric information from the iris of the eyes

6

of maintenance of way employees at the work location, then comparing this information with information on file with the Carrier to verify the employee's identity and attendance at the work location. As explained in Plaintiff's Exhibit 5 and Defendant's Exhibit 8, which is information about the technology provided to the Union by the Carrier in response to the Union's demand for such information, the technology involves illuminating the iris, or colored diaphragm in the eye,[3] with low level infra red (IR) illumination similar to that used in a wireless television remote control, then capturing an image of the iris using a camera similar to that in a home video camcorder situated at a distance of 8 to 13 inches from the employee's eyes. The Carrier represents that, in the system it intends to use, the image of the iris recorded by the camera is recorded as a complex numerical code; that no personal data and no physical characteristics or confidential personal information about an individual is stored in the system; and that, unlike a digital photograph, proprietary software does not permit the numerical code to be used to generate, print, or develop a substitute image of an individual's iris. Thus, the Carrier contends, and the court finds, that "iris recognition technology" provides a simple, noninvasive alternative to a manual roll call, involving no physical contact with the equipment and no hygiene or safety issues, and, just as importantly for payroll and attendance purposes, the technology cannot be

---

[3]The iris is not the retina of the eye and "iris recognition technology" is not "retinal scanning." The iris is the colored diaphragm at the front of the eye perforated by the pupil. *Cf.* STEDMAN'S MEDICAL DICTIONARY 923 (27th ed. 2000) (defining "iris" as "[t]he anterior division of the vascular tunic of the eye, a diaphragm, perforated in the center (the pupil), attached peripherally to the scleral spur; it is composed of storma and a doble layer of pigmented retinal epithelium from which are derived the sphincter and dilator muscles of the pupil"). The retina, on the other hand, is located at the back of the eye and receives visual light rays and transfers sensory information to the optic nerve and, thus, to the brain. *Cf. id.* at 1558 (explaining, *inter alia*, that the "optic part" of the retina "receives the visual light rays").

7

fooled by an individual while accurately recording an individual's attendance in the resulting time records.

### 4. Testing and plans to roll out the new system

The court finds that, in 2005, the Carrier began looking for ways to improve the system for timekeeping in the field and to improve data security. The Carrier determined that iris recognition technology was suitable to replace the roll call process of determining attendance, at least for large gangs, because it is reliable, easy to use, efficient, and involves no contact, hygiene, or safety issues. Therefore, in August 2006, the Carrier conducted a test of iris recognition technology to record attendance and timekeeping information with System Rail Gang 9101, the Carrier's largest gang, while the gang was working in Illinois. The Carrier represents that it explained the technology to gang members and that not one member of the gang complained about use of the iris recognition technology either before, during, or after the test.

The Union did not participate or acquiesce in the test on gang 9101. Instead, upon learning of the test, the Union protested the change in the status quo represented by use of iris recognition technology and demanded bargaining on the issue in a letter dated October 2, 2006, from its president, Freddie Simpson, to the Carrier's Vice President of Labor Relations, John Marchant. *See* Plaintiff's Exhibit 1.

More specifically, in that letter, the Union described the use of iris recognition technology as "an illegal unilateral change in working conditions." *Id.* (page 1 of letter). Although the letter represented that the Union "does not intend to stand in the way of enhanced security, nor of technological change," the letter also asserted that the Union "will not stand by while such a radical and far-ranging change in biological intrusion to our members is unilaterally forced upon them." *Id.* (page 3 of letter). The letter made the following specific demands:

8

1.  You must immediately transmit detailed information to us disclosing the scope of the Iris scanning project, including who is doing it, the protocols and requirements, and the exact information being gathered, and most important, what information is drawn from the scans. This extends to the purpose(s) of the project, and the legal or functional warrants or needs claimed to justify the introduction of biometrics to our workplace. Your intentions and plans, including, [sic] all written statement [sic] and outline of the scope and nature of the long-term program, are also critical here.

2.  You must contact [the Union's] designated representative on this matter, Vice President Roger Sanchez, within the next ten days to discuss the entire subject and create a preliminary agreed understanding for proceeding, pending more detailed planning and agreements. [Contact information omitted.]

3.  You must temporarily suspend the program, or at the very least, strictly limit it to the existing system gang scope, with no expansion whatever beyond that, until (2) has been completed.

*Id.* (pages 2-3 of letter).

The Carrier responded with a letter dated October 5, 2006, to Mr. Sanchez from Wayne Naro, the Carrier's General Director of Labor Relations, with attachments explaining the iris recognition technology that the Carrier was testing. Plaintiff's Exhibit 2 (letter only); *see also* Defendant's Exhibit 8 (letter with attachments). Mr. Naro explained that the Carrier "is exploring use of this technology for security purposes and as part of a new timekeeping system," and that the intent was to scan employee's irises at the beginning and end of each work shift, using the scan to automatically record the employee's time, as well as to identify and track others who enter the Carrier's property.

9

*Id.* (page 1 of letter).  The Carrier also represented that it intended to return to gang 9101 for further testing on October 10 and 11, 2006, and that, if those tests were successful, "it is the Carrier's intent to roll [the iris recognition technology] out to all system gangs after the first of the year."  *Id.* (page 2 of letter).  In addition, the Carrier disputed the Union's contention that introduction of such technology was an "illegal and unilateral change in working conditions," because the Carrier asserted that it had historically introduced new technologies to enhance the way it does business without first reaching agreements with affected unions.  *Id.*  While the Carrier conceded that "the collective bargaining agreements do not address the Carrier's use of such systems," the Carrier also asserted that "[t]hey certainly do not prohibit its use," and that the Carrier, therefore, had the right to introduce the new technology without entering into agreements with the Union.  *Id.*  The letter also informed the Union that a demonstration of the iris recognition technology had been arranged for November 13, 2006, at the Carrier's Omaha offices.

Representatives of the Union did attend the demonstration on November 13, 2006, which included representatives of the vendors of the pertinent technology and software. The demonstration included a simulated check in and check out process.  After the demonstration, the Carrier reiterated its intention to implement the iris recognition technology on January 1, 2007, for large rail and tie gangs, then later implement the iris recognition technology for remaining Union members.  No bargaining concerning introduction of the iris recognition technology occurred at the demonstration, however.

On November 14, 2006, the Union, through its General Chairmen for the Carrier, served a notice on the Carrier under Section 6 of the RLA, 45 U.S.C. § 156, demanding that the Carrier engage in bargaining according to the Act's Section 6 procedures over the issue of the Carrier's "introduction of biometric data technologies, their administration, and the use and storage of employees' biometric data obtained by the Carrier," including

10

within its definition of "biometric data" what the Union called "iris of the eye mapping."
Plaintiff's Exhibit 3; *see also* Defendant's Exhibit 9.  The Carrier's response to the
Union's Section 6 Notice came in a letter dated November 17, 2006, from Robert F.
Allen, Chairman of the National Railway Labor Conference (NRLC), which acknowledged
receipt of the Section 6 Notice on behalf of the Carrier by the National Carriers'
Conference Committee (NCCC), as the Carrier's duly authorized representative.
Plaintiff's Exhibit 4; Defendant's Exhibit 10.  Although the letter from the NRLC
expressly reserved the NRLC's right to question the legality and propriety of the Union's
Section 6 Notice, the letter also suggested that further handling of the parties' dispute
identified in the Section 6 Notice be addressed by "national handling" in the ongoing
discussions between the Rail Labor Bargaining Coalition (RLBC), as the Union's
bargaining representative, and the NCCC under the auspices of the National Mediation
Board (NMB).  The Union contends that the present dispute does not properly fall within
the ongoing discussions before the NMB and that the Carrier has neither exhausted the
procedures of Section 6 of the RLA nor been released by the NMB from mediation, so that
the Carrier is not free under the self-help provisions of the RLA to implement iris
recognition technology without agreement by the Union.

The Union represents, and the Carrier does not dispute, that, at some point in late
2006 and after the Union filed the Complaint initiating this lawsuit, in-house counsel for
the Carrier advised counsel for the Union that the Carrier did not contemplate any roll out
of its iris recognition technology prior to March 2007, but contemplated, instead, only
limited testing of the technology on unspecified dates in January and February 2007.  The
court has not been presented with any evidence that any roll out or testing of the iris
recognition technology has actually occurred since November 2006.

11

Nevertheless, apparently dissatisfied with the Carrier's response to its complaints about the introduction of iris recognition technology, the Union commenced the present litigation in December 2006.

### 5. *Relevant collective bargaining agreements*

Before turning to the procedural history leading to the present motions, the court finds it appropriate to identify here the provisions of certain collective bargaining agreements (CBAs) that the Carrier contends are relevant to the present proceedings. Notwithstanding that, in November 2006, the Carrier asserted that the CBAs between the parties do not address, and certainly do not prohibit, use of the iris recognition technology at issue here, the Carrier now asserts that the Union and the Carrier are parties to four CBAs covering the Carrier's maintenance of way employees, two of which are directly at issue here. The two CBAs identified as relevant by the Carrier are the October 7, 1959, Agreement (the 1959 Agreement) and the February 7, 1965, Agreement (the 1965 Agreement). Although the Union asserts that the parties are currently involved in negotiations for certain amendments to the CBAs between them, the Union asserts that the present dispute has not been a subject of those negotiations.

The part of the 1959 Agreement identified by the Carrier as relevant here provides as follows:

ARTICLE I - PRIOR CONSULTATION

In the event a carrier decides to effect a material change in work methods involving employes [sic; passim] covered by the rules of the collective agreement of the organization party hereto, said carrier will notify the General Chairman thereof as far in advance of the effectuation of such change as is practicable and in any event not less than fifteen (15) days prior to such effectuation. If the General Chairman or his representative is available prior to the date set for effectuation

12

of the change, the representative of the carrier and the General Chairman or his representative shall meet for the purpose of discussing the manner in which and the extent to which employes represented by the organization may be affected by such change, the application of existing rules such as seniority rules, placement and displacement rules and other pertinent rules, with a view to avoiding grievances arising out of the terms of the existing collective agreement and minimizing adverse effects upon the employes involved.

* * *

*This Article does not contain penalty provisions and it does not require that agreement must be reached as the right of the carrier to make changes in work methods or to continue existing practices subject to compliance with the collective agreement is not questioned.*

Defendant's Exhibit 1 (emphasis added). The part of the 1965 Agreement identified by the Carrier as relevant provides as follows:

ARTICLE III - IMPLEMENTING AGREEMENTS

Section 1 –

*The organizations recognize the right of the carriers to make technological, operational and organizational changes,* and in consideration of the protective benefits provided by this Agreement the carrier shall have the right to transfer work and/or transfer employees throughout the system which do not require the crossing of craft lines. The organizations signatory here to shall enter into such implementing agreements with the carrier as may be necessary to provide for the transfer and use of employees and the allocation or rearrangement of forces made necessary by the contemplated change. One of the purposes of such implementing agreements shall be to provide a force adequate to meet the carrier's requirements.

Defendant's Exhibit 4 (emphasis added).

13

## B. Procedural Background

### 1. The original complaint and the motion for preliminary injunction

The Union filed its original Complaint (docket no. 2) in this matter on December 15, 2006. It its Complaint, the Union asserted a single claim that the Carrier's proposed implementation of iris recognition technology abrogates the status quo of the parties' established practice regarding employee duties to report at a report site, in violation of Sections 2, 5, and 6 of the RLA, 45 U.S.C. §§ 152, First, 155, and 156. The claim asserts that the Union will be irreparably harmed and the public injured if the Carrier unilaterally implements iris recognition technology for taking attendance without following the statutory procedures of the RLA, and seeks preliminary and permanent injunctions enjoining the Carrier from altering the status quo by implementing iris recognition technology pending exhaustion of mandatory procedures of the RLA. The Union also seeks declaratory judgment that the Carrier's actions violate the status quo of the RLA, costs of the action, and such other relief as the court deems equitable and just.

On December 29, 2006, the Union also filed a Motion For Preliminary Injunction (docket no. 6), seeking a preliminary injunction enjoining the Carrier from implementing the iris recognition technology. That motion was apparently premised on the assumption that the Carrier would begin to roll out its iris recognition technology on or about January 1, 2007, despite admitted assurances from the Carrier that it only intended to test the iris recognition technology in January and February 2007 and did not plan a system-wide rollout of its iris recognition technology until March 2007. The court construed the Union's motion to be or to include a request for a temporary restraining order and set the motion for prompt hearing. However, in an *ex parte* conversation, the plaintiff's counsel represented to the court that the hearing on the original motion for preliminary injunction was no longer needed. Therefore, by order dated January 2, 2007 (docket no. 9 and order

14

*nunc pro tunc* docket no. 10 correcting a typographical error), the court denied the plaintiff's original Motion For Preliminary Injunction without prejudice to reassertion.

### 2. *The renewed motion for preliminary injunction and the motion to dismiss*

On January 19, 2007, the Union renewed its Motion For Preliminary Injunction (docket no. 19). The Union's renewed motion and accompanying submissions are nearly identical to its submissions with its original Motion For Preliminary Injunction, so that it is unclear what, if any, circumstances had changed between denial of the original motion upon the Union's representation that no hearing was needed and the renewed motion presently before the court. This time, however, the Carrier filed responses to the Union's filings, consisting of the Carrier's January 29, 2007, Motion To Dismiss For Lack Of Subject Matter Jurisdiction (docket no. 21), and its January 29, 2007, Opposition To Plaintiff's Motion For Preliminary Injunction (docket no. 22). In its Motion To Dismiss, the Carrier asserts that this court lacks subject matter jurisdiction over the Union's Complaint, because the parties' dispute is not a "major" dispute within the meaning of the RLA and is, instead, a "minor" dispute for which the exclusive remedy is arbitration.

The court found that the issues presented in the two motions are intertwined to the extent that both involve the question of whether the parties' dispute is a "major" or "minor" dispute. Moreover, if the parties' dispute is a "minor" dispute, this court would not have subject matter jurisdiction to enter a preliminary injunction or to grant any other relief. Under these circumstances, the court entered an order dated February 6, 2007 (docket no. 25) setting a joint hearing on February 13, 2007, on the pending motions and requiring the Union to respond to the Carrier's motion to dismiss for lack of subject matter jurisdiction by February 12, 2007. The court also instructed a member of his staff to advise the parties by e-mail that, if the parties did not intend to present evidence, the court believed that it would be more efficient to hold arguments on the pending motions by

15

telephone and, thus, to save the parties' travel expenses. The Union actually filed its Opposition To Defendant's Motion To Dismiss And Reply Memorandum In Support Of Plaintiff's Motion For Preliminary Injunction (docket no. 28) on February 9, 2007, then shortly thereafter amended that Opposition to include properly numbered exhibits (docket no. 30).

### 3. *The amended complaint and clarification of issues for hearing*

On February 6, 2007, the same day that the court filed its order setting a hearing on the pending motions, the Union filed its First Amended Complaint (docket no. 24). Shortly before filing that First Amended Complaint, the Union's counsel advised a member of the undersigned's staff of the Union's intent to file the amendment, adding that the amended complaint does not involve any new factual allegations regarding the "status quo" issue which is before the court on the Union's renewed Motion For Preliminary Injunction, nor does it alter the issues that are before the court on the Motion For Preliminary Injunction.

In light of the filing of the Union's First Amended Complaint, the Carrier's counsel sent an e-mail to a member of the undersigned's staff requesting clarification of the issues to be heard in the February 13, 2007, hearing. Hoping to clarify matters, the court entered an order on February 8, 2007 (docket no. 27), explaining that the hearing would not address in any way Count II of the plaintiff's First Amended Complaint, but that, if the parties intended to submit evidence related to either of the motions pending before the court, they must do so at the February 13, 2007, hearing, and could not expect the court to hold open the record for submission of such evidence at a later date. On February 9, 2007, both parties advised the court that they believed that the February 13, 2007, hearing could proceed in the form of telephonic oral arguments. Therefore, by order dated February 9, 2007 (docket no. 29), the court set the pending motions for telephonic oral

16

arguments on February 13, 2007, and set a deadline of February 12, 2007, for the exchange and filing of any affidavits, declarations, or exhibits upon which the parties intended to rely but which had not already been filed with briefs on the motions. In that same order, after noting that the Union had already filed its resistance to the Carrier's Motion To Dismiss on February 9, 2007, the court also set a deadline of February 12, 2007, for the filing of the Carrier's reply, if any, in further support of its Motion To Dismiss.

The Carrier filed its Reply memorandum In Support Of Defendant's Motion To Dismiss For Lack Of Subject Matter Jurisdiction (docket no. 31) prior to the deadline on February 12, 2007. Neither party filed any exhibits in addition to those already filed with their motions and briefs.

The court heard oral arguments on the pending motions as scheduled on February 13, 2007. The Union was represented at the oral arguments by William R. Wilder of Baptiste & Wilder, P.C., in Washington, D.C., who presented the Union's argument, and Scott H. Peters of the Peters Law Firm, P.C., in Council Bluffs, Iowa. The Carrier was represented by Henry N. Carnaby, in-house counsel for the Carrier in Omaha, Nebraska, who presented the Carrier's arguments, and Patrick L. Sealey of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., in Sioux City, Iowa.

As the court noted at the conclusion of the oral arguments, the parties' briefs and arguments were comprehensive and illuminating. Therefore, the pending motions are now fully submitted.

17

## II. LEGAL ANALYSIS

As the court observed, above, the issues presented in the two motions now before the court are intertwined to the extent that both involve the question of whether the parties' dispute is a "major" or "minor" dispute. Thus, the first question for the court is which of the intertwined motions, the Union's Motion For Preliminary Injunction or the Carrier's Motion To Dismiss For Lack Of Subject Matter Jurisdiction, to address first.

The answer is determined by the nature of subject matter jurisdiction. As the Eighth Circuit Court of Appeals has recently reiterated, "Subject matter jurisdiction refers to the court's power to decide a certain class of cases." *LeMay v. United States Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (citing *Continental Cablevision of St. Paul, Inc. v. United States Postal Serv.*, 945 F.2d 1434, 1437 (8th Cir. 1991)). "It is axiomatic that the federal courts lack plenary jurisdiction." *Southwestern Bell Tel. Co. v. Connect Communication Corp.,* 225 F.3d 942, 945 (8th Cir. 2000) (citing *Godfrey v. Pulitzer Publ'g Co.,* 161 F.3d 1137, 1141 (8th Cir. 1998)). Rather, "[t]he inferior federal courts may only exercise jurisdiction where Congress sees fit to allow it." *Id.* More specifically, because "[f]ederal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Marine Equip. Management Co. v. United States,* 4 F.3d 643, 646 (8th Cir. 1993) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986), in turn citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)); *see also Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1171 (8th Cir. 1994) (federal court jurisdiction is limited by Article III of the Constitution), a federal court has a duty to assure itself that the threshold requirement of subject matter jurisdiction has been met in every case. *Bradley v. American Postal Workers Union, AFL-CIO,* 962 F.2d 800, 802 n. 3 (8th Cir. 1992) (citing *Sanders, infra* ); *Thomas v. Basham,* 931 F.2d 521, 523 (8th

18

Cir. 1991); *Jader v. Principal Mut. Life Ins. Co.,* 925 F.2d 1075, 1077 (8th Cir. 1991); *Barclay Square Properties v. Midwest Fed. Sav. & Loan Ass'n,* 893 F.2d 968, 969 (8th Cir. 1990); *Sanders v. Clemco Indus.,* 823 F.2d 214, 216 (8th Cir. 1987). Similarly, "[t]he parties . . . may not confer subject matter jurisdiction upon the federal courts by stipulation, and lack of subject matter jurisdiction cannot be waived by the parties or ignored by the court." *Pacific Nat'l Ins. Co. v. Transport Ins. Co.,* 341 F.2d 514, 516 (8th Cir.), *cert. denied,* 381 U.S. 912 (1965); *see also Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 25 (Stevens, J., concurring) ("[T]he cases are legion holding that a party may not waive a defect in subject-matter jurisdiction or invoke federal jurisdiction simply by consent," citing *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 377 n. 21 (1978); *Sosna v. Iowa,* 419 U.S. 393, 398 (1975); *California v. LaRue,* 409 U.S. 109, 112 n. 3 (1972); *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 17-18 & n. 17 (1951); *Mitchell v. Maurer,* 293 U.S. 237, 244 (1934); *Jackson v. Ashton,* 33 U.S. (8 Pet.) 148, 149 (1834)), *overruled on other grounds, Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996); *Lawrence County v. South Dakota,* 668 F.2d 27, 29 (8th Cir. 1982) ("[F]ederal courts operate within jurisdictional constraints and ⋯ parties by their consent cannot confer subject matter jurisdiction upon the federal courts."). Thus, even where "'the parties did not raise any jurisdictional issues[, t]his court is obligated to raise such jurisdictional issues if it perceives any.'" *White v. Nix,* 43 F.3d 374, 376 (8th Cir. 1994) (quoting *Lewis v. United States Farmers Home Admin.,* 992 F.2d 767, 771 (8th Cir. 1993)). Therefore, courts must resolve challenges to subject matter jurisdiction first. *United States v. Negele,* 222 F.3d 443, 446 (8th Cir. 2000) (citing *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 95 (1998)).

Because federal courts cannot hear cases that fall outside of the limited jurisdiction granted to them, *Southwestern Bell Tel. Co.,* 225 F.3d at 945; *Marine Equip. Management*

19

*Co.*, 4 F.3d at 646, and such courts must resolve challenges to subject matter jurisdiction first, *Negele*, 222 F.3d at 446, this court must address questions about its jurisdiction raised in the Carrier's Motion To Dismiss For Lack Of Subject Matter Jurisdiction before it can address the Union's Motion For Preliminary Injunction. In doing so, the court must keep in mind that, notwithstanding that it must first be satisfied of its subject matter jurisdiction, "[t]he Supreme Court recently affirmed that federal courts "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given,'" and that "'[t]he one or the other would be treason to the Constitution.'" *Night Clubs, Inc. v. City of Fort Smith, Ark.,* 163 F.3d 475, 478 (8th Cir. 1998) (quoting *New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350, 358 (1989), in turn quoting *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404 (1821)).

### A. *The Motion To Dismiss For Lack Of Subject Matter Jurisdiction*

Having determined that the court must address the Carrier's Motion To Dismiss For Lack Of Subject Matter Jurisdiction first, the court's analysis of that motion begins with a summary of the arguments of the parties concerning whether or not this court can properly exercise subject matter jurisdiction over the Union's claim that the Carrier has unlawfully altered the statutory status quo between the parties by seeking to impose, unilaterally and in derogation of statutory and collective bargaining requirements, "iris recognition technology" to record attendance of employees. That claim is now Count I of the Union's First Amended Complaint.[4]

---

[4]There has been no challenge to the court's subject matter jurisdiction over Count II of the First Amended Complaint, so that, even if the court grants the Carrier's Motion To Dismiss, that disposition will not necessarily dispose of the entire case. Although the court

(continued…)

Case 5:06-cv-04103-MWB   Document 34   Filed 02/16/07   Page 20 of 43

### 1. Arguments of the parties

#### a. The Carrier's initial argument

In its brief in support of its Motion To Dismiss For Lack Of Subject Matter Jurisdiction,[5] the Carrier argues that the Union's claim that the Carrier has violated the status quo under the CBAs by unilaterally implementing iris recognition technology is a "minor" dispute under the RLA over which federal courts lack subject matter jurisdiction. The Carrier notes that, while "major" disputes under the RLA involve disagreements about what the terms of a CBA should be, "minor" disputes are grievances or disagreements about the meaning of the parties' existing CBAs. Thus, a "minor" dispute may be

---

[4](...continued)

is aware that it has the authority to consider *sua sponte* its subject matter jurisdiction over the remaining count in the Union's First Amended Complaint, *see White*, 43 F.3d at 376 (even where "'the parties did not raise any jurisdictional issues[, t]his court is obligated to raise such jurisdictional issues if it perceives any'") (quoting *Lewis*, 992 F.2d at 771); *see also Myers v. Richland County*, 429 F.3d 740, 745 (8th Cir. 2005) ("'Any party *or the court* may, at any time, raise the issue of subject matter jurisdiction.'") (quoting *GMAC Commercial Credit, L.L.C. v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 828 (8th Cir. 2004) (emphasis added), it will not do so here in the absence of an opportunity for the parties to brief that question. It suffices for now to raise the question, for the parties' consideration, of whether there is a basis for subject matter jurisdiction over the claim in Count II that is independent of or in addition to the jurisdictional basis asserted for Count I, in the event that the court determines that it lacks subject matter jurisdiction over Count I. *See id.* (the court is obligated "to raise" the jurisdictional issue, if it perceives any).

[5]The Carrier's brief in support of its Motion To Dismiss expressly incorporates arguments concerning lack of subject matter jurisdiction first articulated by the Carrier in its resistance to the Union's renewed Motion For Preliminary Injunction. The court has, likewise, looked to the parties' arguments concerning subject matter jurisdiction, consisting of arguments about whether the present dispute is "major" or "minor" within the meaning of the RLA, in the briefing of both motions now pending before the court.

21

conclusively resolved by interpreting the existing CBAs. Under the RLA, interpretations of the CBAs, *i.e.*, "minor" disputes, are consigned to the exclusive jurisdiction of RLA arbitrators. Thus, once a dispute is determined to be "minor," the court must dismiss the action raising the dispute for lack of subject matter jurisdiction. The Carrier argues that the classification of whether a dispute is "major" or "minor" is a question of law, but courts are to presume that only a "minor" dispute exists to further the public policy favoring resolution of labor disputes by arbitration, rather than in the courts. Thus, the Carrier argues that a dispute is "minor" unless the carrier's interpretation of the CBA is "frivolous" or "obviously unsubstantial."

The Carrier argues that, here, it has a non-frivolous argument about the meaning of the parties' existing CBAs, as demonstrated by express and implied agreements and past practices allowing the Carrier to introduce new technology, so that this court lacks subject matter jurisdiction over the present "minor" dispute concerning implementation of iris recognition technology for taking attendance. More specifically, the Carrier argues that the plain language of the 1959 Agreement and the 1965 Agreement permits the Carrier to implement new technology, such as iris recognition technology. The Carrier explains that this is so, because the first agreement specifically states that the Carrier's right to change the work methods of Union members is "not questioned," and the adoption of iris recognition technology will only change the method whereby Union members report their attendance and hours of work, thus clearly falling within this provision. Similarly, the Carrier points out that the second agreement specifically recognizes the Carrier's right to make "technological, organizational and operational changes" that affect Union members, and its implementation of iris recognition technology clearly falls within the scope of such authorized changes. The Carrier also contends that past practices support its interpretation of these CBAs as permitting the unilateral implementation of iris recognition technology,

Case 5:06-cv-04103-MWB   Document 34   Filed 02/16/07   Page 22 of 43

because it is undisputed that the origins of past timekeeping practices were not the result of negotiation between the parties; indeed, the Carrier points out that the Union has not identified any prior occasion on which the parties negotiated timekeeping practices nor any provision of any existing agreement that bars the Carrier from introducing new technology such as iris recognition technology. The Carrier asserts that there is no special privacy concern that might make the introduction of iris recognition technology different, because it is non-intrusive and does not store any biometric data that could raise privacy concerns. Thus, the Carrier contends that iris recognition technology is really no different from photographs on company identification badges, which are already required of Union member employees. The Carrier also points out that the Union has acquiesced in the introduction of new technologies that had a much more profound effect upon the way Union member employees do their jobs.

### b.    The Union's response

Contrary to the Carrier's contentions, the Union asserts that the Carrier's unilateral implementation of iris recognition technology constitutes an illegal change in the status quo giving rise to a "major" dispute. The Union argues that it is undisputed that, for decades, employees have been required to do nothing more than acknowledge their presence at the work site to a foreman or timekeeper when roll is called. The only past "technological" changes in the procedure, according to the Union, have been changes in the way the Carrier records attendance, not changes in the methods by which the employees demonstrate their attendance, because the employees did nothing different to register their attendance, whatever method the timekeeper used to record their attendance. The Union also argues that there have been no interim changes in the employees' duties in registering their attendance at the work site, so that there is no history of management exercising its supposed prerogative to introduce new technology in this instance. The Union argues that

23

nothing in prior agreements can even arguably justify such a dramatic departure from the parties' established practice and that the Carrier has admitted that nothing in any agreement addresses its use of biotechnology systems. Because the status quo between the parties, including their actual practices, is to be broadly interpreted, the Union argues that those practices cannot be deemed to include collection of biometric information. Changes in the existing practices, the Union argues, must be bargained for.

Turning to more specific arguments concerning what agreements between the parties do or do not permit, the Union argues that it is not enough, as the Carrier argues, that prior agreements do not expressly preclude the change in practices that the Carrier now contemplates. Nor, the Union argues, should *post hoc* contract-based justifications for the Carrier's actions, such as reliance on certain isolated language in a few CBAs, be accepted, where the Carrier previously acknowledged that the CBAs do not address the issue of biometric technology. More specifically, the Union argues that the 1959 Agreement does not deal with the introduction of biometric technology, the collection and storage of personal biological information, or the parties' attendance practices, so that interpretation of the 1959 Agreement cannot conclusively resolve the parties' dispute, as it must for that dispute to be "minor." Rather, the Union characterizes the 1959 Agreement as dealing with classifications and pay rates for new positions created as a result of introducing new technology for work methods, such as new equipment to be used in performing maintenance work. The Union asserts that the Carrier's reliance on the 1965 Agreement is also flawed, because that agreement also has nothing to do with the biometric technology at issue here. Rather, the Union argues that the 1965 Agreement deals only with job protection rights in seniority, pay protection, and job location for employees affected by redundancies created by the introduction of new technology for work methods. Because use of iris recognition technology will not result in the elimination

24

of any positions for Union members, the Union argues that interpretation of the 1965 Agreement will not conclusively resolve the parties' dispute about unilateral implementation of new technology for timekeeping and attendance. Finally, the Union argues that introduction of iris recognition technology will alter decades-long practices concerning attendance obligations with no relation to the work methods of the Union's members. As such, the Union contends that the present dispute is "major" and, therefore, within this court's subject matter jurisdiction.

### c. *The Carrier's reply*

In reply, the Carrier asserts that the court's role in determining whether a dispute is "major" or "minor" is quite limited, involving only the determination of whether the employer's asserted contractual justification for its position is "frivolous." If the court determines that the employer's position is not "frivolous," the Carrier contends, then the court lacks subject matter jurisdiction, and the dispute must be resolved in binding arbitration. Here, the Carrier contends that both the express language of two CBAs and the parties' practices thereunder establish that the Carrier's argument that it can unilaterally implement technology that impacts the work methods of Union members, including the attendance and timekeeping systems, is not frivolous. The Carrier contends that the Union rebutted none of this evidence. Rather, the Carrier argues, the Union asks the court to go beyond its jurisdiction and become the parties' arbitrator, interpret the CBAs, and decide which party's position is correct. Specifically, the Carrier contends that the Union wants the court to decide what "work method" and "technological . . . change" mean under the two CBAs that the Carrier has cited. The Carrier also contends that the Union is ignoring the parties' past practice, which the Carrier contends demonstrates that it has previously made technology-driven changes to the attendance and timekeeping systems used by Union members. Thus, the Carrier reiterates that it has clearly met its "light" burden to show

25

that this is a "minor" dispute over which this court does not have subject matter jurisdiction.

### 2. Standards for dismissal for lack of subject matter jurisdiction

Rule 12(b)(1) of the Federal Rules of Civil Procedure expressly provides for a pre-answer motion to dismiss for "lack of jurisdiction over the subject matter," but, because subject matter jurisdiction goes to the court's power to hear the case, "'[a]ny party or the court may, at any time, raise the issue of subject matter jurisdiction.'" *Myers v. Richland County*, 429 F.3d 740, 745 (8th Cir. 2005) (quoting *GMAC Commercial Credit, L.L.C. v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 828 (8th Cir. 2004). When the challenge to subject matter jurisdiction comes in the form of a Rule 12(b)(1) pre-answer motion, the question may be resolved either on the face of the pleadings or upon factual determinations made in consideration of matters outside of the pleadings. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v. United States*, 918 F.2d 724, 729 & n.6 (8th Cir. 1990). In a facial challenge, the court must accept all factual allegations in the complaint as true, draw all inferences in the plaintiff's favor, and grant the motion to dismiss only if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *See Young America Corp. v. Affiliated Computer Services, Inc.*, 424 F.3d 840, 843-44 (8th Cir. 2005) (citing *Titus*, 4 F.3d at 593). On the other hand, when the parties rely on materials outside of the pleadings in asserting or opposing the motion, thereby turning the challenge into a factual one, the court is entitled to resolve factual issues to determine its jurisdiction. *McClain v. American Economy Ins. Co.*, 424 F.3d 728, 734 (8th Cir. 2005) (citing *Osborn*, 918 F.2d at 728 & n.4). As the Eighth Circuit Court of Appeals has explained, dismissal for lack of subject matter jurisdiction is appropriate only in those rare instances when the challenged claim "'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and

26

frivolous.'" *Trimble v. Asarco, Inc.*, 232 F.3d 946, 953 (8th Cir. 2000) (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)).

### 3. Subject matter jurisdiction under the Railway Labor Act

Congress passed the Railway Labor Act (RLA), 45 U.S.C. §§ 151-188, "[t]o promote stability in labor-management relations." *Pittari v. American Eagle Airlines, Inc.*, 468 F.3d 1056, 1060 (8th Cir. 2006) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994)). Under the RLA, a dispute is classified as either "minor" or "major," and "[t]he distinction is important when establishing jurisdiction because minor disputes must be submitted to binding arbitration." *Brotherhood of Maintenance of Way Employees v. Burlington Northern Santa Fe R.R.*, 270 F.3d 637, 638-39 (8th Cir. 2001) (*BMWE*). Aggrieved employees "'may not resort to the courts in the first instance,'" if their complaint involves only a "minor" dispute. *Smith v. American Airlines, Inc.*, 414 F.3d 949, 952 (8th Cir. 2005) (quoting *Penn R.R. v. Day*, 360 U.S. 548, 552 (1959)). Instead, "[u]nder the RLA, minor disputes are subject to mandatory arbitration before an adjustment board which has primary jurisdiction to construe the collective bargaining agreement." *Id.* On the other hand, if the dispute is "major," the "'the parties are obligated to maintain the status quo' while they pursue 'a lengthy process of bargaining and mediation.'" *United Transp. Union v. Kansas City Southern Ry. Co.*, 172 F.3d 582, 585 (8th Cir. 1999) (quoting *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989)). "There is a presumption that disputes are minor and thus arbitrable." *Bloemer v. Northwest Airlines, Inc.*, 401 F.3d 935, 939 (8th Cir. 2005) (citing *Jenisio v. Ozark Airlines, Inc. Retirement Plan*, 187 F.3d 970, 973 (8th Cir. 1999)); *see also BMWE*, 270 F.3d at 639 ("[I]f doubt arises about the classification of a dispute, the dispute is also considered to be minor."); *United Transp. Union*, 172 F.3d at 588 ("'[W]hen the surrounding circumstances are ambiguous, the court's favor construing

27

the dispute as minor.'") (quoting *Alton & Southern Lodge No. 306 Brotherhood Ry. Carmen v. Alton & Southern Ry.*, 849 F.2d 1111, 1113 (8th Cir. 1988), *cert. denied*, 492 U.S. 905 (1989)).  In light of this presumption, the Eighth Circuit Court of Appeals has reiterated that the party asserting that the dispute in question is "minor" "shoulders a 'relatively light burden' in establishing exclusive arbitral jurisdiction under the RLA." *Jenisio*, 187 F.3d at 973 (quoting *Schlitz v. Burlington N.R.R.*, 115 F.3d 1407, 1414 (8th Cir. 1997)).

Notwithstanding that the distinction between "major" and "minor" disputes is critical to the court's jurisdiction under the RLA, "'[t]he terms major and minor dispute do not appear in the RLA itself.  Instead, they are judicially-created nomenclature for the statutory categories.'"  *United Transp. Union v. Kansas City Southern Ry. Co.*, 172 F.3d 582, 585 n.1 (8th Cir. 1999) (quoting *Sheet Metal Workers' Int'l Ass'n v. Burlington N. R. Co.*, 893 F.2d 199, 202 n.2 (8th Cir. 1990), in turn citing *Elgin, J & E. Ry. v. Burley*, 325 U.S. 711, 723-24 (1945)).  Under this judicially-created nomenclature, there is no bright line to differentiate a "major" dispute from a "minor" dispute.  *BMWE*, 270 F.3d at 639.  Indeed, "[t]he issue is 'often a question of degree and turns upon the facts in each case.'"  *United Transp. Union*, 172 F.3d at 586 (quoting *Sheet Metal Workers'*, 893 F.3d at 202).  Nevertheless, generally speaking, "minor" disputes are "'controversies arising out of the application or interpretation of the collective bargaining agreement.'"  *Pittari*, 468 F.3d at 1060 (quoting *Gore v. Trans World Airlines*, 210 F.3d 944, 949 (8th Cir. 2000)); *BMWE*, 270 F.3d at 638 (defining a "minor" dispute as one "involving interpretation and enforcement of existing CBAs").  "Major" disputes, on the other hand, "involv[e] the creation of new contractual rights."  *BMWE*, 270 F.3d at 638.

More specifically, a "minor" dispute is a controversy "'over the meaning of an existing collective bargaining agreement in a particular fact situation.'"  *Smith*, 414 F.3d

28

at 952 (quoting *Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 33 (1957)); *see also Pittari*, 414 F.3d at 942 ("minor" disputes are "'disputes involving duties and rights created or defined by the collective bargaining agreement'") (quoting *Gore*, 210 F.3d at 949). To put it another way, "minor" disputes seek to enforce contractual rights, *United Transp. Union*, 172 F.3d at 586, so that the distinguishing feature of a "minor" dispute is that it may be conclusively resolved by interpreting an existing agreement. *Consolidated Rail Corp.*, 491 U.S. at 305; *Sheet Metal Workers'*, 893 F.2d at 203 (quoting *Consolidated Rail Corp.*). Thus, "'[c]ourts can resolve questions of federal . . . law involving labor claims,'" *i.e.*, have subject matter jurisdiction over such claims, "'only if the issues do not require the court to construe the collective bargaining agreement.'" *Pittari*, 468 F.3d at 1060 (quoting *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir. 1998), in turn citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411 (1988)). In *BMWE*, for example, the Eighth Circuit Court of Appeals concluded that a dispute was "minor," because the district court correctly found each party's position was arguably justified by the language of the CBA and because resolution of the dispute would "turn on" the meaning of a particular clause of the CBA in question, which required employees to utilize Carrier-provided lodging before the employee was entitled to a meal allowance. *BMWE*, 270 F.3d at 639. The court also rejected the union's contention in that case that the railroad's past practice of paying five meal allowances per week showed that the railroad's current position was frivolous or insubstantial, because while relevant to the merits of interpreting the contested CBA provision, the railroad's past practice did not alter the "minor" nature of the parties' dispute. *Id.* Therefore, the court held that the district court correctly determined that it lacked subject matter jurisdiction over the parties' dispute. *Id.*

Case 5:06-cv-04103-MWB   Document 34   Filed 02/16/07   Page 29 of 43

In contrast to a "minor" dispute, which concerns enforcement of contractual rights, a "major" dispute seeks to create contractual rights. *United Transp. Union*, 172 F.3d at 586. Somewhat more specifically,

> Major disputes involve questions relating to the formation of, or efforts to secure, labor agreements. *Sheet Metal Workers'*, 893 F.2d at 202 (citing *Elgin, J. & E. Ry.*, 325 U.S. at 723, 65 S. Ct. 1282). Major disputes "'look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.'" *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R. Co., (Lodge 16)*, 802 F.2d 1016, 1021 n. 3 (8th Cir. 1986) (quoting *Elgin, J. & E. Ry.*, 325 U.S. at 723-24, 65 S. Ct. 1282).

*United Transp. Union*, 172 F.3d at 586. An example of a "major" dispute is a dispute about the *effects* that the sale of an unprofitable portion of the railroad will or might have on its employees, although a dispute about the proposed sale itself was not a "major" dispute. *Railway Labor Executives' Ass'n v. Chicago and Northwestern Transp. Co.*, 890 F.2d 1024, 1025-26 (8th Cir. 1989) (citing *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, 491 U.S. 490 (1989)).

The Eighth Circuit Court of Appeals explained the analytical procedure for determining whether a dispute under the RLA is "major" or "minor" as follows:

> "Characterizing the nature of the dispute 'depends on whether it is arguably comprehended within the agreement of the parties.'" [*Sheet Metal Workers'*, 893 F.2d] at 203 (quoting *Lodge 16*, 802 F.2d at 1022). In making "this determination, the court must determine the terms of the agreement." *Id.* "The parties' agreement includes the written collective-bargaining agreement and [the parties'] past practices." *Id.* It is important to stress, however, that the court "need not interpret the terms of the agreement." *Id.* The purpose of the inquiry, rather, "is to determine whether

30

[the] case implicates a question of contract interpretation." *Id.*
(quotations and citations omitted).

Once a court determines the terms of the parties'
agreement, it must then determine whether the particular
dispute is comprehended within that agreement. "Verbal
formulations of this [inquiry] have differed over time and
among the Circuits: phrases such as 'not arguably justified,'
'obviously insubstantial,' 'spurious,' and 'frivolous' have been
employed." *Consolidated Rail*, 491 U.S. at 306, 109 S. Ct.
2477 (footnote omitted). *See also Sheet Metal Workers'*, 893
F.2d at 203 (collecting and summarizing the various standards
and formulations). For example, a case is deemed minor if the
railroad's assertion that the dispute implicates a question of
contract interpretation is not obviously insubstantial. The
differences between these formulations is not critical,
[because] each "'illustrate[s] the relatively light burden which
the railroad must bear' in establishing exclusive arbitral
jurisdiction under the RLA." *Consolidated Rail*, 491 U.S. at
307, 109 S. Ct. 2477 (quoting *Lodge 16*, 802 F.2d at 1022).

*United Transp. Union*, 172 F.3d at 586. Although the Eighth Circuit Court of Appeals
recognized in *United Transportation Union* that the differences in formulation of the
inquiry for the second step are not critical, there is, nevertheless, a three-factor test in this
circuit for determining whether a dispute is comprehended within an agreement, which
considers "[1] whether the agreement is reasonably susceptible of the interpretations sought
by both the employer and the employees; [2] whether the employer's action can be
arguably justified under the terms of the existing agreement; and [3] whether the
employer's argument that its actions are within the contract is obviously insubstantial."
*Id.* at 588 (internal quotation marks and citations omitted) (citing *Sheet Metal Workers'*,
893 F.3d at 203). The court held that the district court's analysis had been incomplete,
because it considered only one of these factors. *Id.*

31

**4.** ***Is the present dispute "major" or "minor"?***

    **a.** ***Terms of the pertinent agreements***

As explained above, the first step in the analysis of whether a dispute is "major" or "minor" within the meaning of the RLA—that is, whether the nature of the dispute is arguably comprehended within the agreement or agreements of the parties—is to determine the terms of the agreement or agreements. *Id.* at 586. The Union contends that there simply are no pertinent agreements, because the Carrier's *post hoc* assertion that terms of the 1959 Agreement and the 1965 Agreement are implicated is contrary to the Carrier's admission that no CBA addresses the use of biotechnology systems. The court does not agree. The Carrier's admission that "the collective bargaining agreements do not address the Carrier's use of such systems," *i.e.*, biotechnology systems specifically, is not the same as an admission that no CBA addresses the implementation of technologies more generally, at least where the Carrier clarified that assertion by adding that the CBAs "certainly do not prohibit [their] use." Plaintiff's Exhibit 2 (letter only); *see also* Defendant's Exhibit 8 (letter with attachments). To put it another way, the fact that no CBA *addresses* use of certain specific technology does not mean that the case does not *implicate* a question of interpretation of a CBA that does address generally implementation of new technology. *See United Transp. Union*, 172 F.3d at 588 ("The purpose of the [first] inquiry . . . is to determine whether [the] case implicates a question of contract interpretation.") (internal quotation marks and citations omitted).

Here, as the Carrier contends, the 1959 Agreement expressly states, *inter alia*, that "the right of the carrier to make changes in work methods or to continue existing practices subject to compliance with the collective agreement is not questioned." 1959 Agreement, art. I (Defendant's Exhibit 1). Similarly, the 1965 Agreement expressly states, *inter alia*, that "[t]he organizations recognize the right of the carriers to make technological,

Case 5:06-cv-04103-MWB    Document 34    Filed 02/16/07    Page 32 of 43

operational and organizational changes, and in consideration of the protective benefits provided by this Agreement the carrier shall have the right to transfer work and/or transfer employees throughout the system which do not require the crossing of craft lines." 1965 Agreement, art. III, § 1 (Defendant's Exhibit 4). Without interpreting these terms of these agreements, it appears that the parties' dispute over implementation of technology for determining attendance of Union employees does at least implicate a question of interpretation of these contracts, because both contract terms cited by the Carrier pertain to the "right" of the carrier to make changes to work methods, including technological changes. *See United Transp. Union*, 172 F.3d at 586 (the court need not interpret the terms of the agreement, but instead inquires whether the case implicates a question of contract interpretation). While the Union asks the court to construe these terms of these agreements in light of the specific topics that the Union contends were at issue in each agreement, that is precisely the sort of interpretation of the terms of the agreements that the court is not to engage in to make the major/minor dispute determination. *Id.* Thus, at the first stage of the inquiry, the Carrier has identified terms of CBAs between the parties suggesting that the case implicates a question of contract interpretation. *See United Transp. Union*, 172 F.3d at 588 ("The purpose of the [first] inquiry . . . is to determine whether [the] case implicates a question of contract interpretation.") (internal quotation marks and citations omitted).

### b. *Whether the dispute is comprehended within the agreements*

The second step of the inquiry requires the court to determine whether the particular dispute is comprehended within the agreements. *Id.* This step of the inquiry involves consideration of both the express terms of the agreements and the parties' practices. *Id.* ("'The parties' agreement includes the written collective-bargaining agreement and [the parties'] past practices.'") (quoting *Sheet Metal Workers'*, 893 F.2d at 203).

33

*i.    Scope of the agreements*.  At the second step of the inquiry, the court finds it appropriate to consider the Union's contention that the specific subject matter of the CBAs on which the Carrier relies has nothing to do with implementation of iris recognition technology.  *Id.* (at the first step in the analysis, the court need not interpret the terms of the agreement to determine whether the dispute implicates a question of interpretation of the terms of the agreement, but at the second step, the court must determine whether the carrier's contention that the parties' dispute implicates a question of contract interpretation is obviously insubstantial).  Doing so, however, does not convince the court, as the Union argues, that the present dispute is not comprehended within the parties' agreement.

The Union argues strenuously that, where an agreement does not address the specific subject matter of implementation of iris recognition technology, a dispute about implementation of such technology cannot be "conclusively resolved" by interpreting that agreement, so that such an agreement does not demonstrate that the parties' dispute is "minor."  *See Consolidated Rail Corp.*, 491 U.S. at 305 (the "distinguishing feature" of a "minor" dispute is that it "may be conclusively resolved by interpreting the existing agreement"); *Sheet Metal Workers'*, 893 F.2d at 203 (quoting *Consolidated Rail Corp.*).  The court believes, however, that the Union has misconstrued the "conclusively resolved" test.  In *Consolidated Rail Corporation*, the Supreme Court explained that the line between "major" and "minor" disputes depends upon "whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action," such that "the dispute may be conclusively resolved by interpreting the existing agreement."  *Consolidated Rail Corp.*, 491 U.S. at 305 (citing *Elgin, J & E. Ry. v. Burley*, 325 U.S. 711 (1945)).  This test is not cast in terms of the existing agreement "specifically addressing" the "specific subject matter" of the parties' dispute, but in terms of the existing agreement "establish[ing] or refut[ing] the presence of a right to take the

34

disputed action." In this court's view, an existing agreement can "either establish or refute the presence of a right to take the disputed action," thus "conclusively resolv[ing]" the dispute "by interpreting the existing agreement," where, for example, the agreement recognizes a general right to take a broad class of actions as part of the context for more specific terms of the agreement on a specific subject matter or concerning a more specific subclass of actions.

Here, the Union is correct that the 1959 Agreement deals primarily with classifications and pay rates for new positions created as a result of introducing new technology for work methods, such as new equipment to be used in performing maintenance work. *See* 1959 Agreement (Defendant's Exhibit 1). However, before turning to more specific subject matter, the 1959 Agreement acknowledges the broader proposition that the Carrier's "right . . . to make changes in work methods or to continue existing practices subject to compliance with the collective agreement is not questioned." *Id*. The court concludes that acknowledgment of the broad proposition that the Carrier has a right to make changes in work methods establishes the context of the specific terms of the agreement concerning rates of pay. Because the 1959 Agreement recognizes the broader proposition that carriers have the right to change work methods, the Agreement comprehends the present dispute about implementation of technology that, at least arguably, changes work methods. More specifically, the language of the 1959 Agreement broadly recognizing the "right [of the Carrier] to make changes in work methods" is reasonably susceptible of the interpretation that it permits the Carrier to implement iris recognition technology for attendance and timekeeping purposes, because implementation of such iris recognition technology could be reasonably construed as a change in work methods pertaining to attendance and timekeeping. *United Transp. Union.*, 172 F.3d at 588 (first of three factors in the analysis of the second inquiry). Similarly, the court must

35

agree with the Carrier that its actions to implement the iris recognition technology are at least arguably justified under this term of the 1959 Agreement, and that its argument that its actions are within the contractual "right" in the 1959 Agreement are not obviously insubstantial, in light of the language actually used in the 1959 Agreement to recognize the "right." *Id.* (second and third factors).

The Union also argues that the 1965 Agreement deals specifically with job protection rights in seniority, pay protection, and job location for employees affected by redundancies created by the introduction of new technology for work methods, but the use of iris recognition technology will not result in the elimination of any positions for Union members. Therefore, the Union argues that interpretation of the 1965 Agreement will not conclusively resolve the parties' dispute about unilateral implementation of new technology for timekeeping and attendance. Again, the Union is correct about the specific subject matter of the 1965 Agreement, but wrong about whether this Agreement, therefore, has nothing to do with the present dispute. The specific language of the 1965 Agreement upon which the Carrier relies expressly "recognize[s] the right of the carriers to make technological, operational and organizational changes." 1965 Agreement, art. III, § 1 (Defendant's Exhibit 4). As was the case with the language of the 1959 Agreement on which the Carrier also relied, this language in the 1965 Agreement embodies a broader proposition establishing the context of the specific terms of the agreement concerning protection of rights of seniority, pay, and job location by employees affected by redundancies created by the introduction of new technology. Because this term acknowledges the broader proposition that the parties recognize the right of carriers to make technological changes as part of the context of the specific agreement, it supports the Carrier's contention that the 1965 Agreement comprehends a dispute about implementation of technological changes. More specifically, the language of the 1965 Agreement

36

expressly "recogniz[ing] the right of the carriers to make technological, operational and organizational changes" is reasonably susceptible of the interpretation that it permits the Carrier to implement iris recognition technology for attendance and timekeeping purposes, because implementation of such technology is or could be construed to be a "technological," "operational," or "organizational" change. *United Transp. Union.*, 172 F.3d at 588 (first of three factors in the analysis of the second inquiry). Moreover, the court must agree with the Carrier that its actions to implement the iris recognition technology are at least arguably justified under this term of the 1965 Agreement, and that its argument that its actions are within this contractual "right" are not obviously insubstantial, in light of the language actually used in the 1965 Agreement recognizing the "right." *Id.* (second and third factors).

In contrast, for the court to read into statements of broad principles in agreements between the parties limitations on the scope of those statements based on the specific subject matter of the agreements in question—under the guise of determining whether the dispute between the parties is a "major" or "minor" dispute—would require the court to engage in the sort of interpretation of the agreements that is not the proper province of the court. *See United Transp. Union*, 172 F.3d at 586 (the court need not interpret the terms of the agreement, but instead inquires whether the case implicates a question of contract interpretation); *see also Smith, Inc.*, 414 F.3d at 952 (under the RLA, an adjustment board has primary jurisdiction to construe the collective bargaining agreement).

Because this case is comprehended within existing agreements, it must be deemed to involve only a "minor" dispute. *Id.* To put it another way, this is a "minor" dispute, because it is a controversy arising out of the application or interpretation of the collective bargaining agreements. *Pittari*, 468 F.3d at 1060 ("minor" disputes are generally so defined); *BMWE*, 270 F.3d at 638. Resolution of this dispute will turn on the

37

interpretation of the clauses of the agreements identified by the Carrier. *BMWE*, 270 F.3d at 639 (finding that a dispute was "minor," because it would "turn on the meaning" of a particular clause of the CBA in question). Indeed, the Carrier seeks to enforce its contractual rights to implement new technology. *See United Transp. Union*, 172 F.3d at 586 (a "minor" dispute involves enforcement of contractual rights). Therefore, the court holds that the Carrier has met its "'relatively light burden" to establish that the present dispute falls within the exclusive arbitral jurisdiction of the RLA. *Id.* (so characterizing the carrier's burden, quoting *Consolidated Rail*, 491 U.S. at 307); *Jenisio*, 187 F.3d at 973 (so characterizing a carrier's burden, quoting *Schiltz*, 115 F.3d 1414).

      *ii.*    ***The effect of past practice***. The Union, nevertheless, argues that this is a "major" dispute, because implementation of iris recognition technology will purportedly alter the status quo established by past practice, which required employees only to answer to a roll call or otherwise be recognized by the timekeeper at the work location. As the Carrier suggests, a similar contention by this Union was rejected by the Eighth Circuit Court of Appeals in *BMWE*, 270 F.3d at 638. Although past practice concerning attendance and timekeeping "check in" and "check out" procedures may be relevant to the merits of interpreting the contested CBA provisions—particularly as they may relate to "work methods" or "technological, operational and organizational changes"—the Carrier's practice of taking attendance by answers to roll calls or other recognition of employees does not alter the "minor" nature of the parties' dispute in light of existing contractual language. *Id.*

      Moreover, because the record makes clear that answering to a roll call has *not* been the exclusive method for indicating presence and identity for attendance and timekeeping purposes and, instead, shows that other methods of recognizing employees have also been used, the "past practice" does not make the use of iris recognition technology an

38

impermissible departure from the status quo. Indeed, as the iris recognition technology is explained in the record, it is just another form of "recognizing" an employee by non-intrusive means that is different only in degree of specificity, not in nature, from a timekeeper "recognizing" an employee without calling his or her name.

The court finds that the Carrier's contention that the dispute over implementation of iris recognition technology *is* comprehended within the two CBAs it cites cannot be deemed "not arguably justified," "obviously insubstantial," "spurious," or "frivolous." *Id.* (citing these formulations of the standard from *Consolidated Rail*, 491 U.S. at 306). Therefore, the present dispute appears to be only a "minor" dispute that will turn on the interpretation of the CBAs cited by the Carrier. *BMWE*, 270 F.3d at 639 (finding that a dispute was "minor," because it would "turn on the meaning" of a particular clause of the CBA in question).

### c.    *Creation or acquisition of rights*

It is also helpful to contrast the dispute here with what courts have deemed to constitute a "major" dispute within the meaning of the RLA. The Union has not made a single argument that this court recognizes as an attempt to argue that a dispute over implementation of iris recognition technology constitutes a dispute over creation or acquisition of contractual rights. *See United Transp. Union*, 172 F.3d at 586 (characterizing a "major" dispute as involving the creation of contractual rights). While the Union does contend that it now has a "right" to continue the past practice of demonstrating identity and attendance by answering to a roll call, such an assertion of a supposed "right" claimed to have vested in the past, based on past practice, does not constitute a "major" dispute. *See United Transp. Union*, 172 F.3d at 586 ("major" disputes "'look to the acquisition of rights for the future, not to assertion of rights claimed

Case 5:06-cv-04103-MWB   Document 34   Filed 02/16/07   Page 39 of 43

to have vested in the past.'" ) (quoting *BMWE, Lodge 16*, 802 F.2d at 1021 n.3). Thus, this simply is not a "major" dispute.

### d.    *Presumptions*

Although, for the reasons stated above, the court concludes that the Carrier has met its "relatively light burden" to establish that the present dispute falls within the exclusive arbitral jurisdiction of the RLA, *id.* (so characterizing the carrier's burden, quoting *Consolidated Rail*, 491 U.S. at 307); *Jenisio*, 187 F.3d at 973 (same, but quoting *Schiltz*, 115 F.3d at 1414), the court finds that this is a close case. Under the RLA, it is precisely in such situations that the court is to presume that the dispute is "minor," and thus arbitrable. *See Bloemer*, 401 F.3d at 939; *see also MWE*, 270 F.3d at 639 ("[I]f doubt arises about the classification of a dispute, the dispute is also considered to be minor."); *United Transp. Union*, 172 F.3d at 588 ("'[W]hen the surrounding circumstances are ambiguous, the court's favor construing the dispute as minor.'") (quoting *Alton & Southern Lodge No. 306 Brotherhood Ry. Carmen v. Alton & Southern Ry.*, 849 F.2d 1111, 1113 (8th Cir. 1988), *cert. denied*, 492 U.S. 905 (1989)). Although such a presumption *against* the exercise of the court's subject matter jurisdiction may, at first blush, seem to fly in the face of a federal court's obligation not to decline the exercise of jurisdiction when it is given, *see Night Clubs, Inc.*, 163 F.3d at 478 (federal courts "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given,'" and "'[t]he one or the other would be treason to the Constitution'") (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 358, in turn quoting *Cohens*, 19 U.S. (6 Wheat.) at 404 (1821)), it is ultimately in keeping with the principle that "federal courts lack plenary jurisdiction," and "[t]he inferior federal courts may only exercise jurisdiction where Congress sees fit to allow it." *Southwestern Bell Tel. Co.*, 225 F.3d at 945 (citing *Godfrey*, 161 F.3d at 1141). Therefore, the applicable presumption leads the court to

40

reiterate its conclusion that this is a "minor" dispute that falls outside the court's subject matter jurisdiction.

Similarly, the court believes that it has properly applied the burdens and presumptions for a Rule 12(b)(1) challenge to the court's subject matter jurisdiction. The court in *BMWE* noted that the district court had treated the railroad's challenge to subject matter jurisdiction as a "facial" attack on the complaint, not a "factual" attack, had afforded the union the benefit of the presumption that its allegations were true, and had drawn all favorable inferences in the union's favor. *BMWE*, 270 F.3d at 639. Here, in contrast, the Carrier has made a "factual" attack, not just a "facial" attack, on the court's subject matter jurisdiction, so that the court has been allowed to rely on materials outside of the pleadings and to resolve fact issues in determining its jurisdiction. *McClain*, 424 F.3d at 734 (citing *Osborn*, 918 F.2d at 728 & n.4). On the other hand, even assuming that the Carrier's attack is "facial," and that the Union must be afforded the benefit of all presumptions and favorable inferences, the court concludes that the present dispute is still "minor," and the court, therefore, lacks subject matter jurisdiction over that dispute. *BMWE*, 270 F.3d at 639 (even applying the standards for a "facial" attack, the district court properly determined that it lacked subject matter jurisdiction).

### 5. Summary

A "minor" dispute like the present one must be submitted to binding arbitration. *Id.* at 638-39. The aggrieved Union "'may not resort to the courts in the first instance'" over such a dispute. *Smith*, 414 F.3d at 952. That being so, this is one of the rare instances when the challenged claim "'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where [the] claim is wholly insubstantial and frivolous.'" *Trimble*, 232 F.3d at 953 (quoting *Bell*, 327 U.S. at 682-83). Under these circumstances, the Carrier's January 29, 2007, Motion To Dismiss For Lack Of Subject

41

Matter Jurisdiction (docket no. 21) must be granted, and the claim in the Union's original Complaint, which is now Count I of the Union's First Amended Complaint, must be dismissed for lack of subject matter jurisdiction.

## B. The Motion For Preliminary Injunction

The Union's January 19, 2006, renewed Motion For Preliminary Injunction (docket no. 19), sought preliminary injunctive relief on the claim in its original Complaint, which is now Count I of its First Amended Complaint. Because the court does not have subject matter jurisdiction over the claim in Count I, it necessarily lacks subject matter jurisdiction to grant any relief, preliminary or otherwise, on that claim. Consequently, the Union's January 19, 2006, renewed Motion For Preliminary Injunction (docket no. 19) must be denied.

## III. CONCLUSION

The intertwining issue of whether the parties' dispute concerning implementation of iris recognition technology is a "major" or "minor" dispute is ultimately dispositive here of both the Union's Motion For Preliminary Injunction and the Carrier's Motion To Dismiss For Lack Of Subject Matter Jurisdiction. The court finds that the dispute is a "minor" dispute within the meaning of the RLA, because the Carrier has met its relatively light burden to establish that the present dispute falls within the exclusive arbitral jurisdiction of the RLA, where resolution of this dispute will turn on the interpretation of the clauses of the agreements identified by the Carrier. Because the dispute is "minor," the court lacks subject matter jurisdiction and cannot grant the Union any relief on its motion for preliminary injunction.

THEREFORE,

1.      The Carrier's January 29, 2007, Motion To Dismiss For Lack Of Subject Matter Jurisdiction (docket no. 21) is **granted**, and the claim in the Union's original Complaint, which is now Count I of the Union's First Amended Complaint, is **dismissed for lack of subject matter jurisdiction.**

2.      The Union's January 19, 2006, renewed Motion For Preliminary Injunction (docket no. 19) is, likewise, **denied for lack of subject matter jurisdiction**.

**IT IS SO ORDERED.**

**DATED** this 16th day of February, 2007.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

43